**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

WAL-MART REAL ESTATE          *
BUSINESS TRUST,
                              *
      **Plaintiff/Counter-defendant,**
                              *

v.
                              *   **Civil Action No.: 1:21-cv-02319-RDB**

GARRISON REALTY               *
INVESTORS, LLC,
                              *
      **Defendant/Counterclaimant**          *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

<u>**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS GRI'S COUNTERCLAIM**</u>

      Wal-Mart Real Estate Business Trust ("Walmart"), by its undersigned attorney, submits this memorandum in support of its Motion to Dismiss the Counterclaim filed by Garrison Realty Investors, LLC ("GRI").

## I.  <u>Introduction</u>

      The Court recently denied GRI's Motion to Dismiss the Complaint, and is familiar with the Lease[1] at the center of the parties' relationship. ECF Nos. 17. GRI has now filed a Counterclaim (ECF No. 19) that rests on a novel premise. Faced with a tenant that engaged in the lawful permitting process mandated by Baltimore County, timely surrendered possession of the Improvements at Lease end, and then sought redress in Court – a tenant that complied with its obligations under the Lease as well as county and state law – GRI now attacks *this suit* as a breach of contract and a tortious act. ECF No. 19, Counterclaim ¶ 2.

---

[1] Unless otherwise stated, capitalized terms have the meaning assigned to them in the Counterclaim.

In Count I, the Counterclaim asserts that Walmart's "very filing" of this action and a related *lis pendens* notice represent injurious falsehoods that besmirched its title to the Improvements, entitling GRI to at least $25 million in compensatory damages and $85 million in punitive damages. *Id*., ¶ 52.

Count II asserts that Walmart's application for a permit to exercise its right to raze the Improvements to slab under Section 6(a) of the Lease, related acts to prepare the Improvements for demolition, and the filing of this action all represent separate breaches of Section 6(a), Walmart's duty under Lease Section 7 to comply with "all laws and regulations of any governmental authority with respect to the Premises," and Walmart's implied covenant of good faith and fair dealing.

GRI fails to state a cognizable claim for relief. Count I cannot overcome Walmart's absolute privilege to make statements in a judicial filing. Moreover, because Count I misstates Walmart's Complaint, which accurately describes the facts related to title to the Improvements, Count I fails to allege an actionable falsehood. For both of these reasons, the Court should dismiss Count I with prejudice, and with it, GRI's demand for punitive damages.

Count II is also fatally flawed. GRI claims that Walmart's filing of this lawsuit is itself a breach of the Lease. Walmart filed this action to enforce (in part) its rights under the Lease. The Court held that the Complaint states plausible claims for relief. ECF No. 17. Count II, to the extent that it attacks the filing of this lawsuit, is nothing more nor less than a refusal to accept the Court's ruling.

The Counterclaim, in contrast to the Complaint, fails the plausibility test; that is, it does not state facts lifting other alleged breaches of the Lease from the merely possible to the plausible. The Lease contemplates that Walmart may engage in the very act that the Counterclaim challenges:

applying for a permit to raze the Improvements. Walmart's application for that permit from the local governmental authority, as Baltimore County law required, cannot be twisted into a breach of the Lease. Neither can what Walmart allegedly did or did not do in connection with that application. None of the things that GRI says *would* have happened ever *in fact* happened. Moreover, if Walmart's permit application was deficient, that was for Baltimore County – no one else - to determine. Finally, none of these alleged breaches of the Lease was material. For these reasons, the Court should also dismiss Count II of the Counterclaim with prejudice. This case may then proceed, focused, as it should be, on the prosecution of Walmart's claims for breach of contract, unjust enrichment, and specific performance.[2]

## II. Allegations Material to the Motion

Because neither the operative Lease nor the sequence of events has changed since the filing of this action, this section will focus on those allegations of the Counterclaim that are material to Walmart's instant motion.

The Counterclaim rests on the premise that, "[i]n *initiating this action* Walmart has breached its contractual duties to Garrison under the lease and has maliciously slandered Garrison's title to the property." ECF No. 19, Counterclaim ¶ 2. Indeed, according to GRI, "Walmart's *malice* is evidenced ... by [among other things] the very fact that it initiated this action." *Id.*, ¶ 31 (emphasis added).

---

[2] In a footnote to its Answer, GRI appears to take issue with Walmart's unopposed Motion to Amend Complaint to Drop Count Four (ECF No. 15) and the Court's order granting that unopposed motion. ECF No. 19, Answer at 1 n.1. As the Motion to Amend simply sought to drop the last five paragraphs from the Complaint, the filing of a proposed amended pleading showing those last five paragraphs stricken seemed an elevation of form over substance. Walmart of course stands ready to take whatever action the Court deems necessary and appropriate to comply with the local rules.

In the Counterclaim, GRI concedes that Walmart had the right to construct any Improvements on the Premises at its expense, and that, "[u]ntil the expiration or sooner termination" of the Lease term, title to those Improvements lay in Walmart. *Id*., ¶ 14; *see* ECF No. 1-2 at 5-6,[3] § 6(a) ("Until the expiration or sooner termination of this Lease, title to any improvements located on the Premises shall remain in Lessee, and Lessee may at its sole discretion raze such improvements and reduce it to a slab…."). Paragraph 18 asserts that "[a]ll privileges extended to Walmart under the Lease[ ] are subject Walmart's [sic] obligation to 'comply with all laws and regulations of any governmental authority with respect to the Premises,' and 'maintain the Premises in compliance with all applicable laws, rules, regulations and ordinances.'" ECF No. 19, Counterclaim ¶ 18. While Lease Section 7, which this allegation quotes in part, makes no mention of "privileges," Walmart did of course have a duty to "comply with all laws and regulation of any governmental authority with respect to the Premises …." ECF No. 1-2 at 7, § 7. Under Lease Section 22, Walmart's duty to maintain the Premises was expressly "[s]ubject to the provisions of Sections 6(a) and 25 of this Lease …." *Id*. at 13, § 22.

The Counterclaim asserts that there were several alleged breaches of the Lease. The first: "In initiating this action Walmart has breached its contractual duties to Garrison under the lease …." ECF No. 19, Counterclaim ¶ 2. The Counterclaim does not elaborate on this assertion.

Two additional alleged breaches arise from how Walmart applied for a demolition permit. Under this theory, GRI says, Walmart's "sole discretion" to raze the Improvements to slab during the term of the Lease under Section 6(a) was subject to Walmart's obligation to act consistent with applicable law per Lease Section 7. *Id*., ¶¶ 56-57. According to GRI, Baltimore County law required Walmart to obtain approval of a new storm water management plan (sometimes, "SWM

---

[3] All page references to filings are to CM/ECF pagination.

Plan") and grading permits before razing the Improvements; because Walmart did not obtain those approvals, Walmart violated Section 7, and thus Section 6(a). *Id*., ¶¶ 28-30, 58-59.[4]

Finally, GRI alleges that Baltimore County Fire Department personnel responded to a fire alarm at the Premises on or around July 8, 2021; and that,

> [w]hen the firefighters arrived at the Garrison Property,[5] the fire key box was empty, so they were forced to break in to [sic] the building. Upon entry, the Fire Department discovered that the building's fire detection and sprinkler systems had been disabled and were inoperable.

*Id*., ¶ 40. The Fire Department personnel asked that GRI provide a fire watch. *Id*. ¶ 41. GRI alleges that Walmart disabled the Improvements' sprinkler system, and that this "violated … provisions of the Maryland and Baltimore County Fire Prevention Codes and constituted a material breach of the Lease." *See id*., ¶¶ 42-47 (citing Balt. Cnty. Fire Prevention Code § 1:13.3.3.1; NFPA 1 § 16.5.1;[6] NFPA 241 Chapter 7). This last alleged breach is the only one alleged to be "material." *See id.*, ¶ 47 (only paragraph where word "material" is used).

While GRI alleges that "[t]he County ultimately did not issue the approvals necessary for Walmart's demolition of the Improvements to proceed," *id.*, ¶ 34, it nowhere alleges that Walmart applied to the local "governmental authority with respect to the Premises" for a demolition permit. Nevertheless, its own exhibit, part of the Court record, supplies this critical fact. ECF No. 10-2.

---

[4] The Baltimore County Code Sections cited are Baltimore County Code Sections 33-4-107(d)(2) and Section 33-4-110(2)(i). ECF No. 19, Counterclaim ¶ 28.

[5] "Garrison Property" is an undefined term that appears twice in Paragraph 40 of the Counterclaim and nowhere else.

[6] "NFPA" stands for National Fire Protection Association. Though GRI cites "NFPA 1 § 16.5.1," the correct citation to the section quoted is NFPA 1 § 16.6.1 (2021).

The Counterclaim alleges that, when the Lease ended, the Improvements passed to GRI. ECF No. 19, Counterclaim ¶ 35. This action and the filing of a related *lis pendens* notice in the Circuit Court for Baltimore County followed roughly seven weeks later. *Id.*, ¶¶ 36-37.[7]

Count I is for "injurious falsehood (slander of title)." Two allegedly defamatory acts are cited. GRI alleges that "[t]his action and the notice of *lis pendens* are contrary to and falsely deny Garrison's title in the Improvements post-expiration of the Lease." *Id.*, ¶ 50. "By virtue of their very filing, Garrison [sic] published this action and the notice of *lis pendens* to the public at large." *Id.*, ¶ 52. GRI claims that Walmart acted with malice, and seeks, *inter alia*, compensatory damages in excess of $25 million and punitive damages in excess of $85 million. *Id.* at 28-29, Prayer for Relief. GRI's claim for compensatory damages is allegedly based on "the cloud placed on its title to the Improvements," which has prevented GRI from "freely marketing the property to institutional investors, further resulting in lost value of $25 million or more." *Id.*, ¶ 39.[8]

Count II is for breach of contract. *See supra* at 4-5. It alleges no damages and does not state a prayer for relief separate from that for Count I.

---

[7] The Counterclaim refers to the *lis pendens* notice and alleges that it makes actionable defamatory statements, but does not attach a copy of that filing. Walmart provides a genuine and authentic copy of the *lis pendens* notice as Exhibit 1 hereto. *See* ECF No. 17 at 10 n. 2 (citing *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991); *Goines v. Valley Community Services Bd.*, 822 F.3d 159, 168 (4th Cir. 2016)). The Court may also take notice of the *lis pendens* notice as a public judicial filing. *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (2004) (quoting *Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986)) ("Although this case comes to us on a motion to dismiss under Federal Rule of Civil Procedure 12(b), we are not precluded in our review of the complaint from taking notice of items in the public record ….").

[8] GRI also claims as special damages "the attorneys' fees and costs it has incurred in this case which have been reasonably necessary to remove the false cloud on Garrison's title …." GRI cites no contractual or statutory basis for this. *But see infra*, note 17.

### III.   <u>Argument</u>

**A.  The Standard Governing a Motion to Dismiss is Clear.**

"[A] complaint must contain sufficient factual matter" that "'show[s]' – 'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). When it does not, the complaint fails to state a claim upon which relief can be granted, and Rule 12(b)(6) authorizes its dismissal. Fed. R. Civ. P. 12(b)(6).

To survive a Rule 12(b)(6) motion, the legal framework of the complaint must be supported by factual allegations that "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim. *Ashcroft*, 556 U.S. at 678. A complaint should be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

Under this plausibility standard, a complaint must contain "'more than labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'" *Id*. at 555 (quoting *Papasan,* 478 U.S. at 286). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "Determining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Thus, a court considering a motion to dismiss "can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.*

Legal conclusions, labels, and generalizations are entitled to no judicial deference. *Twombly*, 550 U.S. at 555 ("courts are not bound to accept as true a legal conclusion couched as a factual allegation") (cleaned up); *Adcock v. Freightliner LLC*, 550 F.3d 369, 374 (4th Cir. 2008) (citation omitted) (While well-pled facts are accepted as true, a reviewing court is "not bound by the legal conclusions in the complaint."). "Ultimately, '[a] court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer' that the plaintiff is entitled to the legal remedy sought." *Thomas-Lawson v. Koons Ford of Balt., Inc.*, 2020 U.S. Dist. LEXIS 59517, *6 (D. Md. Apr. 6, 2020) (quoting *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, 566 U.S. 937 (2012)).

**B. Because Walmart Had An Absolute Privilege to Publish its Judicial Filings, and the Statements Therein Concerning GRI's Title to the Improvements Are True, Count I Fails to State a Claim for Injurious Falsehood.**

1. Elements of the Tort

The tort of injurious falsehood requires proof that the defendant published "matter derogatory to the plaintiff's title to [the plaintiff's] property, or its quality, or to [the plaintiff's] business in general, or even to some element of [the plaintiff's] personal affairs, of a kind calculated to prevent others from dealing with [the plaintiff], or otherwise to interfere with [the plaintiff's] relations with others to [the plaintiff's] disadvantage …." *Beane v. McMullen*, 265 Md. 585, 607-608 (1972) (citing Prosser, *The Law of Torts*, § 128, pp. 919-20 (4th ed. 1971)). The plaintiff must also "plead and prove not only the publication and its disparaging innuendo, as in defamation, but something more. There is no presumption, as in the case of personal slander, that the disparaging statement is false, and *the plaintiff must establish its falsity* as a part of [plaintiff's] cause of action." *Id*. at 608 (quoting Prosser) (cleaned up) (emphasis added). The plaintiff must

always plead and prove a pecuniary loss. *Rite Aid Corp. v. Lake Shore Investors*, 298 Md. 611, 623-24 (1984) (quoting Prosser, *The Law of Torts*, § 128, p. 922; Prosser, Comment f to § 623A of *Restatement, Second, Torts* (1977); Dobbs, *Law of Remedies*, § 6.7, p. 504).

    2.  Absolute Immunity

    Even if one assumes for the sake of argument that Count I states a claim of injurious falsehood, it fails because Walmart, as a party to litigation, had an absolute privilege to file the Complaint and *lis pendens* notice. Under the so-called "English" rule, which Maryland follows, a party "enjoys absolute immunity from civil liability" for allegedly "defamatory statements made in the courtroom during the course of the trial, [and for] such statements published in documents which have been filed in a judicial proceeding." *Norman v. Borison*, 418 Md. 630, 650-51 (2011) (citing *Keys v. Chrysler Credit Corp.*, 303 Md. 397, 404 (1985); *Adams v. Peck*, 288 Md. 1, 3 (1980)).[9] This is so even if the statement is wholly unrelated to the underlying proceeding, *id.* at 650 (citing *Keys*, 303 Md. at 404), or malicious, *id.* at 651 (citing *Adams*, 288 Md. at 3). The privilege is intended to "foster the free and unfettered administration of justice," the "ultimate purpose of [which] is to determine the truth." *Id.* at 651-52 (citing *Keys*, 303 Md. at 404, and *Adams*, 288 Md. at 5). This requires "the free divulgence of information in pursuit of justice." *Id.* at 654.

---

[9] In *Norman*, the circuit court dismissed a multi-count complaint alleging the publication of defamatory falsehoods in pleadings given to media outlets. Most counts were dismissed on the basis of absolute privilege; the count for injurious falsehood was dismissed as "duplicitous." 418 Md. at 646. The plaintiff did not appeal dismissal of the injurious-falsehood count. *Id.* at 646-47. Nevertheless, the Court of Appeals made it clear that absolute privilege was the "crux of the case," and applied to all of the claims that asserted the publication of defamatory falsehoods related to judicial proceedings. *Id.* at 650.

By definition, a complaint is a document filed in a judicial proceeding. Fed. R. Civ. P. 7(a)(1). So too, a related *lis pendens* notice is a document filed in a judicial proceeding.[10] *See, e.g., Steelcast Ltd. v. Makary*, 2019 U.S. Dist. LEXIS 173228, *6 (N. D. Ill. Oct. 7, 2019) ("Where as here the allegedly false and malicious statements in the constructive trust claims are shielded by an absolute privilege, the corresponding *lis pendens* notices 'enjoy[] the same protection.'") (citation omitted). Indeed, this is well-established. *See, e.g., Lone v. Brown*, 489 A.2d 1192, 1196 (N.J. Super. 1985) ("Thus, we hold that each of the notices of lis pendens was absolutely privileged. Similarly, other jurisdictions have found that the filing of the notice of lis pendens is absolutely privileged in a slander-defamation of title cause of action.") (citing cases). As Count I is based on the "very filing" of these documents filed in judicial proceedings, ECF No. 19,

---

[10] "In Maryland, *lis pendens* is a common law doctrine." *See Greenpoint Mortg. Funding, Inc. v. Schlossberg*, 390 Md. 211, 223 (2005). It concerns "the jurisdiction, power, or control which a court acquires over property involved in a lawsuit pending its continuance and final judgment." *DeShields v. Broadwater*, 338 Md. 422, 433 (1995). *Lis pendens* "generally arises in the context of disputes in which one or more parties have possession of real property and the potential of premature, precipitous, undue or untoward alienation of that property needs to be avoided." *Greenpoint*, 390 Md. at 222-23. "Under the doctrine, an interest in property acquired while litigation affecting title to that property is pending is taken subject to the results of that pending litigation." *DeShields*, 338 Md. at 433. A *lis pendens* does not enjoin the sale of property pending litigation. Rather, its "basic function" is simply "to advise a person who seeks to acquire an interest in property subject to a *lis pendens* that he will be bound by the outcome of the noticed litigation." *Greenpoint*, 390 Md. at 222. The *DeShields* Court explained:

> A *lis pendens* is a general notice of an equity to all the world, not notice of an actual lien. Consequently, *lis pendens* proceedings do not technically prevent alienation; they place a cloud on title to the property and create a priority in favor of the plaintiff, which, if the plaintiff succeeds on the merits of the claim, relates back to the date of the filing of the complaint and, thus, preserve for a successful plaintiff the opportunity to have a lien relating back to the date of the filing of the complaint.

338 Md. at 435 (quoting, inter alia, *Applegarth v. Russell*, 25 Md. 317, 323 (1866)) (cleaned up). *Lis pendens* "literally means a pending lawsuit …." *Id*. at 433. Thus, the *lis pendens* notice merely *gave notice* of the Complaint, already a public document, to the Circuit Court for Baltimore County.

Counterclaim ¶ 52, it cannot survive Walmart's absolute immunity, and should be dismissed with prejudice.

3.   No Falsehood Alleged

Count I does not satisfy the element of falsity required for injurious falsehood. There are no facts alleged showing that Walmart made a disparaging false statement. According to GRI, "[t]his action and the notice of *lis pendens* are contrary to and falsely deny Garrison's title in the Improvements post-expiration of the Lease." ECF No. 19, Counterclaim ¶ 50.  This, of course, is not true. The Lease, which is Exhibit 1 to and incorporated in the Complaint, states unequivocally, "Until the expiration or sooner termination of this Lease, title to any improvements located on the Premises shall remain in Lessee, ...." ECF No. 1-2 at 5-6, § 6(a); ECF No. 1 ¶ 23. The Complaint thus does not "falsely deny" that title to the Improvements passed. It alleges that GRI wrongly engineered this result. Similarly, the *lis pendens* notice is not false. *See Steelcast Ltd.*, 2019 U.S. Dist. LEXIS 173228, *7 ("Here falsity is lacking. To be sure, a *lis pendens* simply provides notice to the public that property is involved in litigation ....").

GRI argued for the "exhibit prevails" rule in moving to dismiss the Complaint. *See* ECF No. 10-1 at 6-7 n.2 (citing *Fayetteville Investors*, *supra*). It should not now be heard to argue that the Lease, Exhibit 1 to the Complaint, should be ignored. *See* ECF No. 17 at 10 n.2. If, "[u]ntil the expiration or sooner termination of this Lease, title to any improvements located on the Premises shall remain in Lessee ...," ECF No. 1-2 at 5-6, § 6(a), then by implication title no longer remained in the Lessee after expiration of the Lease. This Lease provision puts the lie to the allegation that either the Complaint or the *lis pendens* notice falsely denied GRI's title. Because Count I of the Counterclaim fails to allege publication of a falsehood, it fails to state a claim of injurious falsehood and should be dismissed with prejudice.

### C.  The Counterclaim's Demand for Punitive Damages Must Fail with Count I.

To the extent that punitive damages were ever a viable form of relief in this case, they are unavailable for a breach of contract and therefore could only have been awarded under Count I. *Impac Mortg. Holdings, Inc. v. Timm,* 245 Md. App. 84, 125 (2020), *aff'd*, 474 Md. 495 (2021) ("But Mr. Timm is not entitled to punitive damages in any event because they are not available as a form of relief for breach of contract.") (citing *George Wasserman & Janice Wasserman Goldstein Family LLC v. Kay*, 197 Md. App. 586, 636 (2011) (citing *Sims v. Ryland Group, Inc.*, 37 Md. App. 470 (1977))). As Count I is barred by Walmart's absolute privilege and otherwise fails to state a claim, GRI's demand for punitive damages must also fail.

### D.  Count II Fails to Allege a Cognizable Claim for Breach of the Lease.

#### 1.  Breach of Contract

"To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001); *see RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 655 (2010) ("It is well-established in Maryland that a complaint alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'")  (emphasis in original) (citing *Continental Masonry Co., Inc. v. Verdel Constr. Co., Inc.*, 279 Md. 476, 480 (1977)).

"A material breach by one party to a contract excuses the other party from performance." *White Marlin Open, Inc. v. Heasley*, 262 F. Supp. 3d 228, 253 (D. Md. 2017) (citation omitted). "A breach is material 'if it affects the purpose of the contract in an important or vital way.' Whether a breach of contract is material is normally a question of fact, unless 'the issue is so clear that it

may be decided as a matter of law.'" *Id.* (citation omitted); *see Schneider v. Saul*, 224 Md. 454, 461-62 (1961) ("[T]he question of the materiality of a breach is *usually* one of fact.") (emphasis added). In *Airfacts, Inc. v. Amezaga*, 30 F.4th 359 (2022), the Fourth Circuit very recently summarized the Maryland rule on materiality this way:

> A breach is material if it "affects the purpose of the contract in an important or vital way." *Williston on Contracts* offers more guidance, explaining that "[i]n many cases, a material breach of contract is proved by the established amount of the monetary damages flowing from the breach; . . . Conversely, where a breach causes no damages or prejudice to the other party, it may be deemed not to be material."

*Id.* at 364 (quoting *Sachs v. Regal Sav. Bank*, 119 Md. App. 276, 283 (1998); 23 *Williston on Contracts*, § 63:3 (4th ed. 2021) (cleaned up).

2.   The Alleged Breaches

Having failed in its gambit to have the Complaint dismissed, GRI now sues for an allegedly "malic[ious]," "spite[ful]," "arbitrar[y], irrational[ ], unreasonabl[e], [and] bad faith" breach of contract. ECF No. 19, Counterclaim ¶¶ 31, 62-63, 65. Without the benefit of these adjectives, the claim appears to allege only the following:

- "In initiating this action Walmart has breached its contractual duties to Garrison under the lease …," *id.*, ¶ 2;

- "Walmart's conduct in disabling the building's sprinkler systems violated … the Maryland and Baltimore County Fire Prevention Codes and constituted a material breach of the Lease," *id.*, ¶ 47;

- "Walmart's application for a permit to raze the Improvements to slab without seeking or obtaining approval of a new storm water management plan and grading permits breached its obligation under Section 7 to act consistent with applicable law," *id.*, ¶¶ 28, 59; and

- "Walmart … breached Section 6(a) of the Lease by applying for a permit to raze the Improvements to slab on the eve of the Lease's expiration," *id.*, ¶ 66.

None of these four alleged acts is a breach of the Lease, let alone a material breach.

13

3.   Filing Suit

"The mere act of filing a lawsuit generally – and certainly in this case – does not alter the underlying contractual relationship between the parties." *White Marlin Open*, 262 F. Supp. 3d at 255. In this case, the initiation of suit to enforce, in part, Walmart's rights under the Lease does not represent a breach of contract; it most certainly has not impaired any contractual right GRI has or claims. Walmart attempted to exercise its right under Lease Section 6(a) during the initial term of the Lease. At Lease end, however, when Walmart was required to surrender possession of the Improvements to GRI, it did just that. Of this, there is no dispute. ECF No. 19, Counterclaim ¶ 35.

The remaining three alleged breaches all rely on GRI's assertions concerning what various code provisions required of Walmart during the Lease. None of these assertions withstands scrutiny.

4.   Disabling Sprinkler System

Under the standard for a motion to dismiss, the Court should "'separat[e] [a] legal conclusion from the [Counterclaim's] factual allegations, [and] assum[e] the truth of only the factual allegations ...." *Thomas-Lawson*, 2020 U.S. Dist. LEXIS 59517, *6 (quoting *A Society Without a Name*, 655 F.3d at 346); *see Twombly*, 550 U.S. at 555 ("courts are not bound to accept as true a legal conclusion couched as a factual allegation") (cleaned up). To the extent that allegations related to the Improvements' sprinkler system assert various alleged violations of the Maryland and Baltimore County Fire Prevention Codes, the Counterclaim relies on legal conclusions that the Court should disregard.

Beyond this, the allegations having to do with the alleged disabling of the Improvements' sprinkler system, ECF No. 19, Counterclaim ¶¶ 40-47, appear to rest on *at least* one flawed assumption: that fire personnel responding to an alarm are identical to the Authority Having

14

Jurisdiction ("AHJ") to approve demolition procedures.[11] As Paragraph 45 of the Counterclaim concedes, when a demolition is to take place a sprinkler system may be rendered inoperative with approval of the AHJ. ECF No. 19, Counterclaim ¶ 45.[12] While the Counterclaim alleges that fire personnel responded to an alarm at the "Garrison Property" on July 7, 2021, "discovered that the building's fire detection and sprinkler systems had been disabled and were inoperable," and requested that GRI personnel perform a "fire watch," *id.*, ¶¶ 40-41, it does not allege that whoever allegedly disabled the sprinkler system failed to get the AHJ's approval. While *a* possible inference from the Counterclaim's allegations, if credited, is that Walmart did not get the required AHJ approval, an equally possible inference is that individual fire company personnel – who, in Baltimore County, are often volunteers[13] – and the GRI personnel they spoke to were simply unaware of an approval that had been obtained. That is, the Counterclaim alleges only that the

---

[11] The text discussion deals with only one flawed assumption: that a disabling of a sprinkler system is the same as an unauthorized disabling of a sprinkler system. There is, however, another, more fundamental, flawed assumption this motion does not address; namely, that Walmart disabled the sprinkler system. Walmart did not, and wants there to be no mistaking that. As this is, however, a motion to dismiss, Walmart assumes the truth of the allegation for the sake of argument only. *Thomas-Lawson*, 2020 U.S. Dist. LEXIS 59517, *5-6 ("In reviewing a Rule 12(b)(6) motion, a court 'must accept as true all of the factual allegations contained in the complaint' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'") (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)). Even with those facts assumed, because the Counterclaim fails to allege that no AHJ approval was granted regarding the sprinklers, GRI has failed to plead a set of facts upon which relief can be granted and dismissal is proper.

[12] Under National Fire Protection Association codes and standards, an Authority Having Jurisdiction is defined as "an organization, office, or individual responsible for enforcing the requirements of a code or standard, or for approving equipment, materials, an installation, or a procedure"; for example, a fire chief or fire marshal. NFPA 1 § 3.2.2 (2021); NFPA 1 § A.3.2.2 (2021).

[13] The Owings Mills Volunteer Fire Company and Garrison-Station 19 of the Baltimore County Fire Department are located within two miles of the Premises. *See* https://www.baltimorecountymd.gov/departments/fire/stations/index.html (last accessed: Sept. 21, 2022).

sprinkler system was rendered inoperative; it does not allege that the sprinkler system was rendered inoperative *without approval*. Thus, even if, *arguendo*, GRI's theory of liability is credited, the Counterclaim pleads, *at most*, "facts that are 'merely consistent with' a defendant's liability," and thus "'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

5.   Alleged Failure to Obtain Approvals of SWM Plan and Grading Permits

The Counterclaim asserts that razing the Improvements to slab would have violated the Baltimore County Code:

> 28. Razing the building down to its slab *would* allow the storm water from nearly 3.5 acres of impervious area to discharge in an uncontrolled manner in violation of the approved SWM Plan. Razing the building *would*, therefore, render the system incapable of functioning as intended and constitute a violation of Baltimore County Code Sections 33-4-107(d)(2) and Section 33-4-110(2)(i).

> 29. Upon information and belief, Walmart knew that the demolition of the Improvements *would* require the site to undergo significant regrading.

> 30. Because it is an integral part of the building, razing the building to slab *would* also require removal of the pressure relief walls and cantilever reinforced "keystone" retaining wall. Removal of those walls *would*, in turn, require extensive regrading of the soil surrounding over half of the building's footprint. In addition to an approved grading plan and permit, such work *would* require appropriate sediment control and, pending – and perhaps even after – completion, security fencing to protect the public from risk of serious injury or death from a 30 foot fall. Upon information and belief Walmart knew that its agents had not sought or obtained approval of a new storm water management plan nor grading permits and that obtaining such approvals and permits ordinarily takes months and in some cases years.

ECF No. 19, Counterclaim ¶¶ 28-30 (emphasis added).[14] As with the previous allegation concerning the Improvements' sprinkler system, this passage states a legal conclusion; here, that

---

[14] Though the Counterclaim cites specific provisions of the Baltimore County Code in Paragraph 28, it cites none in Paragraphs 29 and 30, or elsewhere, to support the legal conclusion that "Walmart's application for a permit to raze the Improvements to slab without seeking … grading permits breached its obligation under Section 7 to act consistent with applicable law." ECF No. 19, Counterclaim ¶ 59.

razing the Improvements would violate the Baltimore County Code. The Court need not credit legal conclusions. *Thomas-Lawson*, 2020 U.S. Dist. LEXIS 59517, *6 (quoting *A Society Without a Name*, 655 F.3d at 346); *see Twombly*, 550 U.S. at 555.[15] Considering just the factual allegations, it is apparent that GRI takes unwarranted liberties.

First, consider that GRI uses the conditional auxiliary verb "would" six times in the quoted passage to refer to things that *would* have happened *if* certain other things had happened first:

- *If* razing had occurred, then storm water *would* have flowed uncontrollably;

- *If* razing had occurred, then the storm water system *would* not have functioned properly;

- *If* demolition had occurred, then regrading *would* have been necessary;

- *If* razing had occurred, then removal of pressure-relief walls and a cantilever-reinforced retaining wall *would* have been necessary*;*

- *If* those walls had been removed, then regrading *would* have been necessary*;*

- *If* those walls had been removed, then appropriate sediment control *would* have been necessary; and,

- *If* those walls had been removed*,* then installation of security fencing *would* have been necessary*.*

---

[15] GRI's legal conclusions are not to be credited. If they were considered, however, it would be clear that the two Baltimore County Code sections GRI cites do not even apply here.

That is, Section 33-4-107, which concerns SWM Plans, states in relevant part that "[t]he final stormwater management plan shall serve as the basis for all subsequent *construction*." Balt. Cnty. Code § 33-4-107(d)(2) (emphasis added). Construction is not demolition, as an earlier code section listing the two activities in series demonstrates. *See* Balt. Cnty. Code § 33-2-801(a) (listing, inter alia, "construction, repairs, alterations, removals, dredging, demolitions, or other work ..."). Indeed, GRI has argued this very point in these proceedings. ECF No. 10-1 at 12 (distinguishing construction from demolition).

Similarly, Section 33-4-110(2)(i) says only that "[t]he property owner shall be responsible for maintenance" of privately maintained stormwater management devices, practices, or both. Balt. Cnty. Code § 33-4-110(2)(i). "Maintenance" refers to "the upkeep of property or equipment." "Demolition" is the act of "tear[ing] down, raz[ing]." https://www.merriam-webster.com/dictionary/demolish (Last accessed: Sept. 19, 2022); *see 120 W. Fayette St., LLLP v. Mayor & City Council of Balt. City*, 413 Md. 309, 335 (2010) (using dictionary to determine ordinary meaning of a statutory term); *Kramer v. Liberty Prop. Trust*, 408 Md. 1, 21 (2009) (same). One cannot simultaneously maintain and demolish a device.

None of these contingencies occurred, however, and a claim for breach of contract cannot be based on what would have happened. As one court observed, the principle "of 'woulda, coulda, shoulda' is not recognized by the law of contract." *Dimeo v. Evans*, 2021 N.Y. Misc. LEXIS 7047, *21 (N.Y. Sup. Ct. May 25, 2021).

What *did* occur? As the Counterclaim shows, Walmart always acted within the lawful bounds of the Baltimore County regulatory process for the issuance of a demolition permit. If Walmart intended to exercise its right to raze the Improvements under Lease Section 6(a), it had to seek a permit from the governmental authority with respect to the premises – in this case, the Baltimore County Building Engineer. Balt. Cnty. Code § 35-2-301 ("A person may not erect, construct, repair, alter, remodel, remove, or demolish a building or structure in the county without: (1) Obtaining a written permit signed by the Building Engineer; and (2) Paying the requisite fee for the permit."); ECF No. 1-2 at 7, § 7.[16] Leaving aside the Counterclaim's legal conclusions, as the Court should, what is left is that, in conformity with Lease Section 7, Walmart applied to Baltimore County for a permit to exercise a contractual right, and when Baltimore County did not issue the permit that Walmart needed to proceed, Walmart did not proceed. ECF No. 19, Counterclaim ¶ 34 ("The County ultimately did not issue the approvals necessary for Walmart's demolition of the Improvements to proceed."); *id.* ¶ 35 ("Ownership of the Improvements passed to Garrison on July 31, 2021 when the Lease ended.").

A permit application in Baltimore County should include "plans and specifications showing the nature and character of the work to be done; and … plans and specifications of the building or structure to be … demolished." Balt. Cnty. Code § 35-2-302(b)(1). Unless the County's

---

[16] GRI of course knew this because it wrote to the Director of Baltimore County's Departments of Permits, Approvals and Inspections about Walmart's permit application. ECF No. 10-2.

Building Engineer had waived for cause the requirement to file plans and specifications, the Building Engineer was not to "consider or issue a permit unless all of the information required by the Building Engineer [had been] supplied." *Id.*, § 35-2-302(b)(2), (3). Then, in the ordinary course, the Building Engineer could "deny, revoke, suspend, annul, or modify a permit …." *Id.*, § 35-2-302(d)(1).

In other words, Baltimore County – not GRI – was to determine whether Walmart had "complied with all laws and regulations." Not so very long ago, while discussing the June 28 letter that its counsel sent to Baltimore County (ECF No. 10-2), GRI made the same point:

> Garrison asked that the County require Walmart to demonstrate compliance with the law before issuing any permit. Garrison has no authority or control over Baltimore County or the County's decision whether to grant or deny Walmart's permit application. If Walmart's application did not comply with all applicable laws and regulations, then Walmart's deficient application, rather than Garrison's June 28 Letter, is the reason the County did not issue the permit.

ECF No. 10-1 at 15; *see id.* at 13 ("in all probability, the County on its own would have identified any deficiencies in Walmart's permit application …"). For reasons unstated in the Counterclaim, the County did not issue the permit for which Walmart lawfully applied. Whatever the reason for this – regardless of whether the code sections cited in the Counterclaim do or do not apply to a demolition, *see supra*, note 15 – if, as GRI has itself argued, Walmart's permit application was "deficient," then that was for the Building Engineer to adjudicate. And, to hear GRI tell it, that lawful process operated as GRI said it should. In the end, GRI got "the fruits to which it was entitled under the contract—title to the Improvements at the end of the Lease." ECF No. 19, Counterclaim ¶¶ 34-35, 64. There is no actionable breach in Walmart's alleged failure to obtain approval of a SWM Plan or a grading permit.

6.   Applying for the Demolition Permit

Perhaps this is why the Counterclaim's last gambit is to assert that Walmart's very act of "*applying* for a permit" "breached Section 6(a)." *Id*., ¶ 66 (emphasis added). That is, the Counterclaim asserts that, "for the sole purpose of harming Garrison," Walmart acted with "the calculated purpose of preventing Garrison from realizing the fruits to which it was entitled under the contract—title to the Improvements at the end of the Lease." *Id*., ¶¶ 63-64. The Counterclaim does not, however, explain how this could possibly have been Walmart's purpose – or why it would be material – if, "[u]ntil the expiration or sooner termination of this Lease," title to the Improvements remained in Walmart, ECF No. 1-2 at 5-6, § 6(a), and, promptly upon expiration of the Lease, Walmart surrendered possession of the Improvements as the Lease required, ECF No. 19, Counterclaim ¶ 35. Nor does the Counterclaim explain how Walmart's applying for a demolition permit could breach the Lease when the Lease expressly contemplated Walmart's "sole discretion" to demolish the Improvements and Walmart's having to apply for permits from time to time. ECF No. 1-2 at 5-6, §§ 6(a), 6(c).

In the end, the Counterclaim is GRI's attempt to weaponize, against Walmart, Walmart's doing what the law required if it intended to exercise, or enforce, a contractual right. This is not a cognizable cause of action. Just as "[t]he mere act of filing a lawsuit generally … does not alter the underlying contractual relationship between the parties," *White Marlin Open*, 262 F. Supp. 3d at 255, so too, applying for a permit does not alter the underlying contractual relationship between the parties.

7.   No Material Breach

In reviewing the Counterclaim, one is hard-pressed to find any actual, recoverable damage allegedly due to these claimed breaches of contract. Certainly, none is alleged in Count II, and the

damages prayed are entirely related to Count I. *See* ECF No. 19, Counterclaim at 28-29. The $25 million in compensatory damages allegedly spring from GRI's being unable to market the Improvements "[a]s a result of the cloud placed on its title …." *Id.*, ¶ 39.[17]

It would appear, therefore, that GRI intends to advance the alleged breaches of contract as a basis to excuse its own breaches. *See White Marlin Open*, 262 F. Supp. 3d at 253 (quoting *Whiting-Turner Contr. Co. v. Capstone Dev. Corp.*, 2013 U.S. Dist. LEXIS 138636, *23 (D. Md. Sept. 26, 2013) ("A material breach by one party to a contract excuses the other party from performance."). The obstacle to this strategy is that the Counterclaim alleges no facts showing that any of Walmart's alleged breaches of contract affected the Lease in an important or vital way or caused GRI any damages or prejudice. *See Airfacts*, 30 F.4th at 364 (quoting *Sachs v. Regal Sav. Bank*, 119 Md. App. 276, 283 (1998); 23 *Williston on Contracts*, § 63:3 (4th ed. 2021)).

Again, while the Counterclaim frets about what *would have happened if* certain events had happened, none of those events occurred. Where, as here, the Lease concerns Improvements alleged to be worth at least $25 million, and those Improvements are now in GRI's hands, petty cavils about the fact or adequacy of a permit application, or about what might have happened, but did not, are immaterial as a matter of law. Accordingly, the Court may deem these alleged breaches immaterial as a matter of law, and dismiss Count II on this additional, alternative basis.

---

[17] The same may be said of GRI's claim for attorneys' fees. *See* ECF No. 19, Counterclaim ¶ 38 ("In order to remove the cloud on its title to the Improvements, Garrison has expended and will continue to expend substantial sums in attorneys' fees."); *id.*, ¶ 54 (claiming as special damages "the attorneys' fees and costs it has incurred in this case which have been reasonably necessary to remove the false cloud on Garrison's title …."). As GRI cites no contractual or statutory basis to claim attorneys' fees – and Walmart is aware of none – attorneys' fees are not recoverable. *See Henriquez v. Henriquez*, 413 Md. 287, 294 (2010) (internal citations omitted) ("We generally adhere to the 'American rule,' in which each party is responsible for its own legal fees, regardless of who wins in the litigation. Fee shifting, an exception to the American rule, whereby a court orders payment of the prevailing party's attorneys' fees by the losing side, may be accomplished by an express agreement or by statute.").

## IV. <u>Conclusion</u>

For the foregoing reasons, the Court should dismiss GRI's Counterclaim with prejudice, and grant Walmart such other and further relief as the Court deems just and appropriate.

Dated:  September 28, 2022

<div style="margin-left:40%;">

_____/s/_____

Andrew Gendron (Bar No. 05111)
andrew.gendron@lewisbrisbois.com
LEWIS BRISBOIS BISGAARD & SMITH LLP
100 Light Street, Suite 1300
Baltimore, MD 21202
(t)  410.525.6414
(f)  410.779.3910

*Attorney for Walmart*

</div>